IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CHRIS LANGONE,<br><br>       Plaintiff,<br><br>v.<br><br>PATRICK KAISER and FANDUEL, INC.,<br><br>       Defendants. | No.  12-CV-2073<br><br>Judge: Hon. Charles Norgle Sr.<br><br>Magistrate Jeffrey Cole |

## **MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Defendants FanDuel, Inc. ("FanDuel") and Patrick Kaiser are in complete agreement with Defendant Danny Sobot that these lawsuits are an unfortunate continuation[1] of a scheme by Plaintiff Christopher Langone to cash in on an archaic *qui tam* statute in an attempt to take down a respected industry that provides enjoyment to millions of people throughout the world. Langone inappropriately[2] seeks to apply the Illinois Gambling Loss Recovery Act ("LRA"), 720 ILCS 5/28-8(b), to Fantasy Sports contests by suing Illinois residents who competed in the contests (and now even a website operator) to recover alleged "gambling losses" that neither Langone nor the parties alluded to in the complaint have suffered.

The frailty of Langone's gambit is demonstrated by the multiple and inconsistent legal theories he sets forth in the Sobot complaint and the amended complaint in this case. In the Sobot complaint, Langone claims that the website operators are the "losers" in whose shoes he

---

[1] Now in the shoes of a plaintiff, Langone previously was counsel for another plaintiff, attempting to use the same statute against players of on-line poker tournaments. *Crespo v. Saul*, No. 10-cv-05378 (N.D. Ill.); *Crespo v. Zaucha et al.*, 10-cv-05536 (N.D. Ill.); *Crespo v. Seth, et al.*, No. 10-cv-06543 (N.D. Ill.).

[2] In addition to the shortcomings detailed in this motion to dismiss, it is defendants' position that fantasy sports contests are not illegal gambling because they are exempted from the gambling statute as "bona fide contests of skill." 720 ILCS 5/28-1(b)(2).

1

stands seeking recovery, whereas in the amended complaint in this case, he claims both that the same website operators are "winners" against whom he seeks recovery and that the contest participants are the "losers" of the same money that he seeks in the Sobot complaint. In sum, Langone's complaint is nothing more than a fishing expedition desperately seeking some legal and factual basis. This Court should not countenance such a cavalier, shot-gun approach and therefore should dismiss the complaint with prejudice.

## I.     Background

### A.     Fantasy Sports

Fantasy sports have become an increasingly popular part of American sports culture. "They have earned a place in modern popular culture and are the subject of countless newspaper and magazine articles, books, internet message boards, and water-cooler conversations. The enormous popularity of fantasy sports can be attributed in part to the services offered on internet websites, such as those operated by" companies such as Viacom, CBS, the Walt Disney Company, ESPN, the Hearst Corporation, the Sporting News, and many others. *Humphrey v. Viacom, Inc.*, No. 06 2768 DMC, 2007 WL 1797648 (D.N.J. June 20, 2007). Today, *every* major American professional sports league offers its own fantasy tournaments.[3] Nearly 30 million people play fantasy football alone, and fantasy sports is a multi-billion dollar industry.[4] In light of this widespread acceptance by both the public and professional sports, and features

---

[3] Including the NFL (http://www.nfl.com/fantasyfootball), the NBA (http://www.nba.com/fantasy/), MLB (http://mlb.mlb.com/mlb/fantasy/), the NHL (http://www.nhl.com/ice/eventhome.htm?location=/fantasy), and MLS (http://www.mlssoccer.com/fantasy).

[4] See Gene Wang, *Fantasy Football Gets Benched*, WASH. POST, May 29, 2011, at D3 (estimating about 30 million participants in fantasy football); *see also* Zach O'Malley Greenburg, Get Real, Forbes, Mar. 16, 2009, at 70 (estimating a $5 billion dollar industry); Mike Klis, *NFL Preview '07 Football Nation: Fantasy Football*, DENV. POST, Sept. 6, 2007, at J8; Tim Feran, *Back in the Game: Major League Baseball Trying to Reattract (sic) Fantasy Players with New Online Forum*, COLUMBUS DISPATCH, Apr. 3, 2006, available at 2006 WLNR 5582002 ($3 billion market for fantasy football).

that distinguish it from prohibited sports betting, Congress ensured the viability of this multi-billion dollar industry by exempting it from the Unlawful Internet Gambling Enforcement Act, ("UIGEA"). *See* 31 U.S.C § 5362(1)(E)(ix); 31 C.F.R. § 132.2(c)(5)(ix).

### B. The Allegations in the Complaint

The Defendants in this case, Patrick Kaiser ("Kaiser") and FanDuel, Inc. ("FanDuel"), both are involved in fantasy sports, which Plaintiff alleges is prohibited by Illinois gambling law. (FAC ¶¶ 10-13). The complaint provides no detail on the rules of FanDuel's games or how they are played, and alleges only that the "outcome in 'Daily Fantasy' is based solely on the combination of the single performance of an individual athlete in singe real-world sporting events." (FAC ¶ 30). FanDuel's games are thus similar to typical fantasy sports leagues, which "allow participants to 'manage' virtual teams of professional players in a given sport throughout a sport's season and to compete against other fantasy sports participants based upon the actual performance of those players in key statistical categories." *Humphrey v. Viacom, Inc.*, No. 06 2768 DMC, 2007 WL 1797648 (D.N.J. June 20, 2007). FanDuel's offerings differ from the leagues in *Humphrey* only by the duration of the games, which last for one week or one day, and involve from two to ten players and entry fees from $5 to $100. (FAC ¶¶ 24, 33; http://www.fanduel.com/rulesandscoring).[5] The winner of each contest wins a pre-announced prize ranging from $9 to $900. (*Id.*).

Plaintiff Langone alleges that unidentified persons lost more than $50 to Defendants Patrick Kaiser and Fan Duel by participating in these contests. (FAC ¶ 4). As to Kaiser, Plaintiff alleges in Counts II and III that players lost their contest entry fees to Kaiser when

---

[5] In ruling on a motion to dismiss under Rule 12(b)(6), this Court can consider documents attached to the complaint or that are referred to in the complaint and are central to the plaintiff's claim. Fed. R. Civ. P. 10(c); *see Hecker v. Deere,* 556 F.3d 575, 582–83 (7th Cir.2009).

3

Kaiser won, as a participant, unidentified fantasy sports contests. (FAC ¶ 9). As to FanDuel and Kaiser as the operator of www.draftadaysports.com, Plaintiff appears to argue in Count I that they too were winners by virtue of their retention of the difference between the total amount of entry fees for any given contest and the amount paid out in pre-announced prizes. (FAC ¶ 37). Langone provides no detail regarding who lost money to either FanDuel or Kaiser or how much money those players lost, and instead alleges only lump sums of winnings for unidentified contests involving unidentified players over the course of certain periods of time.[6]

### C. The Illinois Loss Recovery Act

While fantasy sports contests are a relatively new phenomena, the statute on which Plaintiff relies has existed since 1823,[7] and finds its roots in the 1710 Statute of Queen Anne, an English statute that allowed losers at gambling to sue to recover losses incurred "at any [t]ime or sitting by playing at [c]ards, [d]ice, [t]ables or other [g]ame or [g]ames whatsoever or by betting on the [s]ides or [h]ands of such as do play at any of the [g]ames aforesaid." 9 Anne ch. 19 (1710), *reproduced* in 9 Statutes of the Realm (George Eyre & Andrew Strahan, pubs., 1810-1822). At the time they were enacted, gambling loss recovery statutes served the purpose of preventing gamblers and their families from becoming destitute due to gambling losses—and thus becoming wards of the State—and to act as a supplement to states' generally anti-gaming provisions at a time when states themselves had few resources to combat illegal gambling.[8]

---

[6] Plaintiff's complaint mentions several individuals by name, but fails to allege that they lost money—instead stating that "circumstantial evidence suggests" or it is "more likely than not" than an individual lost money participating in fantasy sports contests. (FAC ¶¶ 50-52). Such allegations are not sufficient. *See, e.g.*, *Business Guides, Inc. v. Chromatic Comms. Enterprises, Inc.*, 498 U.S. 533, 551 (1991).

[7] R.L. Ill 1823, pp. 320, 321 §§ 2, 5.

[8] *See e.g., Vinson v. Casino Queen, Inc.,* 123 F.3d 655, 657 (7th Cir.1997) (the LRA "was intended to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism."); *Salomon v. Taft Broadcasting Co.,* 16 Ohio App.3d 336, 475 N.E.2d 1292, 1293 (Ct. App. Pt Dist., 1984) (loss recovery act was "born in a vanished era where the absence of an organized police authority to enforce

4

In light of the "ancient and arguably anachronistic nature of *qui tam* actions" to recover gambling losses, which are creatures of "a vanished era where the absence of an organized police authority to enforce criminal statutes made necessary the use of such rewards for informers," the District of New Jersey warned against "extend[ing] the coverage of a 200-year old statute to an activity far removed from the traditional gaming it was never intended to cover." *Humphrey*, 2007 WL 1797648 at *5, 11 (*quoting Salomon v. Taft Broadcasting Co.*, 16 Ohio App. 3d 336, 475 N.E.2d 1292, 1298 (Ct. App. 1st Dist. 1984)). As the *Humphrey* court stated, "[w]hile it is not within the authority of the judiciary to abolish legislative enactments, however obsolete they may arguably appear to be, we certainly are authorized to decline any construction which would extend and enlarge the thrust and scope of the legislation in question." *Id.* at * 5. The Court should do the same here.

## II. Argument

### A. Standard of Review

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in a light favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553-54 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level ...." *Id.* at 555. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Indeed, a plaintiff is required to give sufficient notice of its claims to enable a Court

---

criminal statutes made necessary the use of such rewards for informers"); *see also Berkebile v. Outen,* 311 S.C. 30, 55 (1993) (*qui tam* statute's purpose is to "protect a gambler ... from abusing the vice and exceeding limits which bring harm to the gambler and his or her family"); *Salonen v. Farley,* 82 F. Supp. 25, 28 (E.D. Ky. 1949) (*qui tam* statute was "primarily intended by the legislature ... for the protection of the dependents of those losing in gambling").

5

"to determine at the outset of the litigation, before costly discovery is undertaken, whether the plaintiff has any tenable theory or basis of suit, so that if he does not the case can be got rid of immediately without clogging the court's docket and imposing needless expense on the defendant." *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999).

### B. Plaintiff's Complaint Fails to State a Claim Under the LRA

Plaintiff's complaint is an obvious fishing expedition, hoping to discover a claim for relief. Federal Rule of Civil Procedure 8, however, does not allow a plaintiff to avoid pleading the elements of a claim.[9] Instead of alleging the necessary elements of a claim under the LRA, Plaintiff makes generalized allegations based on alleged gambling loses by unidentified persons, in unknown contests, while playing in undisclosed locations. The LRA does not provide *qui tam* plaintiffs with such extensive power to remedy vague and unspecific alleged wrongs. Instead, the LRA only allows "[a]ny person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more" to recover their loss in a civil action "against the winner thereof." If that individual does not bring suit to recover the amount lost within six months, "any person may initiate a civil action against the winner." *Id.* As such, to state a claim under the LRA, a *qui tam* plaintiff must allege: (1) that an individual lost money; (2) to another person, (3) at "gambling" as defined in 720 ILCS 5/28-1, (4) in Illinois, (5) amounting to more than $50, and (6) the loser has not brought suit within six months.

Plaintiff's failure to provide specifics deserves particularly exacting scrutiny, where he seeks punitive, treble damages under a *qui tam* statute for injuries he did not suffer. "A plaintiff proceeding under the gambling loss recovery *qui tam* statute is legally bound to show with 'clearness and certainty' that his case is 'within the statute.'" *Humphrey* 2007 WL 1797648 at

---

[9] *See, e.g.*, *Szabo Food Svc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir. 1987).

\*5 (citations omitted). Furthermore, penal statutes like the LRA must be construed narrowly. *Id.*, *see also Johnson v. McGregor,* 41 N.E. 558, 560 (Ill. 1895); *Kizer v. Walden,* 65 N.E. 116 (Ill. 1902); *see also State v. Schwabie,* 84 N.E.2d 768, 770-71 (Ohio Ct. App. 1948). As such, statutory conditions must be strictly observed because the right of action exists "by virtue of the statute only." *Johnson,* 41 N.E. at 560. As the *Humphrey* court observed, "These principles of strict and narrow construction are particularly appropriate in this case, where Plaintiff seeks to recover unspecified losses to which he has no personal connection." 2007 WL 1797648, at \*4.

### 1. Neither FanDuel nor Kaiser is a "Winner" Under the LRA and Count I Should Be Dismissed.

Plaintiff's attempt to shoehorn the operator of a contest or tournament into a "winner" from whom he may recover under the LRA would extend the LRA far beyond its statutory text and intended purpose. Rather than identify any bets or wagers defendants made and won, the complaint instead alleges that FanDuel and Kaiser (through www.draftaday.com) operated a number of fantasy sports contests, all of which had a set entry fee and prize amount, and then kept the difference between the entry fee and prize amount. The only similar action ever brought against an operator of a fantasy sports website for recovery of gambling losses was resoundingly rejected. *Humphrey*, 2007 WL 1797648 at \*5, 11. In *Humphrey*, a *qui tam* plaintiff made identical claims to Langone's, claiming that several pay-to-play fantasy sports websites were winners under various state loss recovery acts, including Illinois by virtue of retaining a portion of entry fees. The Court rejected those claims, and specifically held that retention of a portion of entry fees by the administrators of the contests were not "winnings" under various state gambling recovery statutes, including the LRA, because the "winner" must be "a participant in the card, dice or other game at issue." *Id.* at \*4, \*10. As the *Humphrey* court explained, where the "wager" is merely an entry fee, "the element of risk necessary to constitute betting or wagering is

7

missing..." *Id.* at *8. Illinois law requires the same result, because it too mandates that the wager be risked "upon the result" of the game at issue. 720 ILCS 5/28-1(a)(2); *see also Wilson v. Conlin*, 3 Ill. App. 517, 519 (Ill. App. Ct. 1878) (no bet or wager where "[t]he prize money was to be paid to the successful party, but the amount was certain, and did not depend at all on the number of entrances. Therefore the entrance fee had no direct connection with the payment of the prize money."); *Las Vegas Hacienda v. Gibson,* 77 Nev. 25, 359 P.2d 85 (1961) (offering prize to winner of competition does not constitute wagering contract if the offeror does not participate in the competition and has no chance of winning the prize).

FanDuel and Kaiser, acting through draftaday.com, like the operators of fantasy sports contests in *Humphrey*, "[did] not compete for the prizes," and thus cannot be winners for purposes of the LRA. *Id.* at *8. Indeed, neither defendant ever won money *dependent on the result of a bet*. FanDuel and Kaiser are no more "winners" by virtue of operating fantasy sports contests than the country club running a golf tournament wins a golf tournament it offers. Plaintiff has not alleged sufficient facts to support a finding that FanDuel "won" any money at gambling, and as such fails to state a claim under the LRA.[10]

## 2. Plaintiff May Not Recover Under a "Bookmaking" Theory

Plaintiff's attempt to paint FanDuel as a bookie, simply because it organizes a contest, is irrelevant to liability under the LRA. The LRA is limited to any person who "by gambling shall lose to any other person, any sum of money or thing of value," and does not provide Plaintiff with standing to sue Defendants for other alleged violations of the gambling laws such as bookmaking or syndicated gambling. (FAC ¶ 22; 720 ILCS 5/28-1.1(d)). A cause of action for

---

[10] Because the *Humphrey* court found "no substantial difference" between the New Jersey gambling recovery loss statute and the other gambling recovery loss statutes at issue, including the Illinois LRA, its result and reasoning is applicable to this case. *Id.* at *2.

"bookmaking," without alleging a loss "by gambling," simply is not actionable and thus renders Plaintiff's claims that FanDuel engaged in "bookmaking" irrelevant.[11]

### 3. Plaintiff's Claims Against FanDuel and Kaiser Should Be Dismissed Because He Has Failed to Identify any "Losers" Under the LRA.

Plaintiff similarly fails to plead that any particular individual lost money to a defendant "by gambling"[12] or that any of these unidentified individuals failed to seek recovery from the defendant.[13] The LRA's jurisdictional minimum thus requires plaintiffs to identify specific losers as part of alleging that the loser lost the requisite amount and failed to seek recovery. 720 ILCS 5/28-8(b) ("If within 6 months, *such* person who under the terms of Subsection 28-8(a) is entitled to initiate action to recover his losses does not in fact pursue his remedy….") (emphasis added); *see also Humphrey*, 2007 WL 1797648 at * 6 (dismissing complaint because plaintiff "fails to identify even one individual who participated in even one of the subject leagues, much less one who allegedly lost money to Defendants in those leagues.") As Plaintiff is unable to identify such any losers, he cannot state a claim under the LRA and the Complaint should be dismissed with prejudice.

---

[11] Even if bookmaking were actionable under the LRA (which it is not), FanDuel stands in stark contrast to "bookies" that are participants in underlying bets or wagers such that the LRA could provide a means of recovery based on the underlying participation in the bet. *People v. Dugan*, 109 Ill. 2d 8, 13, 485 N.E.2d 315, 317 (1985) (in prosecutions syndicated gambling, a bookie may or may not be a participant in the underlying bet); *see also, People v. Oreck*, 168 P.2d 186, 189-90 (Cal. App. 1946) (describing usual case where bookies participate in bets and engage in "lay off" bets to reduce losses.)

[12] To be clear, defendants contend that fantasy sports contests are not "illegal gambling" but are rather covered by the exception to the statute for "bona fide contests of skill." 720 ILCS 28-1(b)(2). If the case survives in any form, defendants intend to seek discovery and a ruling that winners of Fantasy Sports contests, like golf, bridge and scrabble tournaments, are determined predominantly by skill and thus fall under the exception for offers of prizes to the contestants of bona fide contests of skill.

[13] *See Reuter v Mastercard Int'l*, 921 N.E.2d 1205, 1212 (Ill. App. 5th Dist. 2010) (rejecting claims that failed to identify losers); *Johnson v. McGregor*, 41 N.E. 558, 560 (Ill. Sup. Ct. 1895) (identifying gambling loser); *Vinson v. Casino Queen*, 123 F.3d 655, 657 (7th Cir. 1997) (identifying gambling loser).

Requiring Plaintiff to plead the identity of the losers, rather than merely allege that some unknown gambling loser exists somewhere, is necessary to put Defendants on notice of the claims against them. Without the losers' identity, the defendants cannot determine whether he has jurisdictional challenges to those claims because neither he nor the gambling loser were present in Illinois at the time the alleged loss took place. Likewise, defendants cannot assert defenses based on the application of choice of law rules—such as additional statute of limitations or restrictions on whether third parties may bring suit for alleged gambling losses. Plaintiff's claims should be dismissed.

### 4. Plaintiffs' Claimed Losses Do Not Meet the Jurisdictional Amount

Plaintiff compounds his error in not identifying particular losers by failing to plead that any of those specific unknown individuals lost "any sum of money or thing of value, amounting to the sum of $50 or more." 720 ILCS 5/28-8(a). Rather than allege that particular individuals lost more than $50 in any single contest, Plaintiff instead focuses on each alleged defendant's aggregate "winnings" spread across an unspecified and unidentified number of contests.[14] Such aggregation is unprecedented, and in light of the anachronistic and penal nature of the LRA should not be allowed. *Humphrey*, 2007 WL 1797648 at * 5. In the only case addressing "aggregation" of loss under the LRA, *Zellers v. White*, 70 N.E. 669 (1904), the Court aggregated losses that occurred over numerous hands of poker during the course of one in-person session of play. Here, however, the dates and times of the contests in the complaint are not specified— there is no indication whether the losses "alleged" occurred over the course of days, weeks,

---

[14] With regard to Count I, which seeks to recover the portion of entry fees FanDuel and Kaiser did not pay out in prizes, such amount for any individual contest never exceeded $50 for any contest specifically alleged in the complaint. Indeed, in addition to the fact that such compensation for services – what plaintiff refers to as a "commission, rake or vigorish" (*see* FAC ¶8) – is not a winning under the LRA, virtually no contests offered by defendants would result in a commission to defendants of $50 or more by any individual participant in any individual contest.

months or years. Unlike the aggregation of hands of poker in a single setting, Plaintiff's vague pleading would take the unprecedented step of allowing *qui tam* plaintiffs to aggregate any number of losses occurring over any amount of time to reach the jurisdictional threshold. Such expansive power to aggregate losses would render the jurisdictional minimum nearly superfluous. The LRA simply does not support such an absurd result and requires plaintiffs to identify a single contest in which a person lost more than $50 by gambling.[15] Plaintiffs' claims in Counts I, II, and III based on these aggregated amounts without specifying particular contests in which a person lost more than $50 should be dismissed.

### 5. The LRA is Inapplicable to Conduct Occurring Outside Illinois.

Plaintiff's failure to allege that defendants or the gambling losers were present *in Illinois* when entering each of the contests in the complaint renders the LRA inapplicable and his claims subject to dismissal. The LRA, like any Illinois penal law, only applies if the offense is committed wholly or partly in Illinois or if the activity outside the state is an attempt to commit an offense within the state. 720 ILCS 5/1-5.[16] Such a limitation is consistent with the dormant commerce clause, which precludes a state from regulating activity occurring wholly in another state. *Healy v. The Beer Institute*, 491 U.S. 324, 335-36 (1989) (imposition of one state's laws on individuals in another state violates the commerce clause); *Quill Corp v. North Dakota*, 504 U.S. 298, 306-07 (1992) (same); *Midwest Title Loans v. Mills*, 593 F3d 660, 664-65 (7th Cir. 2010) (same). It also avoids significant conflict of laws issues with laws in other states which limit or bar recovery by gambling losers, require gambling losers to share in their recovery with

---

[15] Otherwise, a party that won a mere $10 could be sued, so long as the defendant lost $50 to some other unnamed defendant. This result would defeat the purpose of limiting jurisdiction only to cases involving significant winnings.

[16] "An offense is committed partly within this State, if either the conduct which is an element of the offense, or the result which is such an element, occurs within the State."

the state, or have conflicting statutes of limitation.[17] The conflict is not merely academic. Many states do not let losers sue to recover losses at all, and it is unclear why Illinois law should allow individuals located in those states to recover in contravention of the loser's state's policy. Allowing plaintiff to recover while standing in the shoes of people who played in a foreign jurisdiction or state other than Illinois would substitute Illinois' policy decisions for those other sovereigns. Plaintiff's failure to plead the location of the gambling losers (or winners) and attempt to seek recovery for losses occurring wholly outside of Illinois requires dismissal.

Illinois courts have recognized the gambling law's limits and upheld dismissal of loss recovery actions because gambling was legal in the location where the losers engaged in gambling and incurred their loss. In *Cie v. Comdata Network, Inc.*, 656 N.E.2d 123, 125 (Ill. App. Ct. 1995), for instance, plaintiffs sought to have cash advances they obtained in legal betting parlors in Illinois and in Nevada casinos deemed unenforceable "gambling contracts" pursuant to Section 28-7, which voids obligations incurred in violation of the Gambling Act.[18] The court held, among other things, that the statutory jurisdictional limit found that "[b]ecause of section 1-5, therefore, Article 28 of the Criminal Code simply does not apply to gambling committed wholly outside of Illinois and defendant's conduct in Nevada was not 'in violation of'

---

[17] *See, e.g.,* Md. Code Crim. L. § 12-110 (no third party actions); Mich. C.L.A. § 750.315 (same); Miss. Code Ann. § 87-1-5 (same); Mo. Ann. Stat. § 434.030 (same); New Mexico Stat. Ann. § 44-5-1 (same); Va. Code Ann. § 11-15 (same, only 3 month statute of limitation); W. Va. Code § 55-9-2 (same); Ala. Code 1975 § 8-1-150 (allowing third party suits, but only on behalf of a wife, child, or next of kin); Mont. Code Ann. § 23-5-131 (no third party suits, but may sue on behalf of a dependent); S.D.C.L. § 21-6-2 (claims must be brought by state's attornye); Indiana Code § 34-16-1-4 (allowing suit only by a prosecuting attorney on behalf of a child, a spouse, or the state general fund); O.C.G.A. § 13-8-3 (requiring a third party plaintiff's recovery to be for the "joint use of himself and the educational fund of the county."); D.C. Code § 16-1702 (requiring third-party plaintiffs to share recovery with the District of Columbia); S.C. Code § 32-1-20; Tenn. Code. Ann. § 28-3-106 (1 year, 3 months statute of limitation).

[18] "All promises, notes, bills, bonds, covenants, contracts, agreements, judgments, mortgages, or other securities or conveyances made, given, granted, drawn, or entered into, or executed by any person whatsoever, where the whole or any part of the consideration thereof is for any money or thing of value, won or obtained in violation of any Section of this Article are null and void." 720 ILCS 5/28-7(a).

the Gambling Act." *Id.* at 129 (citation omitted). Even with respect to the cash advances obtained *inside of Illinois*, because they were obtained for gambling in legal betting parlors, the court stated, "even if we assumed, *arguendo*, that loans for the purpose of legalized gambling are gambling contracts within the meaning of section 28-7(a), we nevertheless conclude that legalized gambling is not gambling 'in violation of' the Gambling Act." *Id.* at 129.

Similarly, the Seventh Circuit upheld the dismissal of a case because the LRA did not apply in the location where the gambling occurred. *Vinson,* 123 F.3d at 657. There a mother sued on behalf of her teenage son, who had snuck onto a riverboat to gamble, alleging that gambling by a minor constituted illegal gambling. The court dismissed the suit because the alleged gambling took place on a riverboat where gambling was legal. Thus, even though a minor cannot legally gamble in Illinois, because the gambling took place in a place where it was authorized, the mother of the minor gambler could not recover.

## III. Conclusion

Plaintiff's complaint, which is riddled with vague, timid allegations and lacks necessary details identifying the parties that lost money at gambling, the specific amounts they lost, whether they even engaged in gambling in Illinois at all, or whether they met the LRA's jurisdictional minimum should be dismissed with prejudice.

Dated: August 17, 2012                                      Respectfully submitted,

/s Bart Huff

Bart Huff
ZwillGen PLLC
300 N LaSalle St, 49th Floor
Chicago, IL  60654
bart@zwillgen.com
(312) 685-2278